**FILED**

**SEP 0 7 2017**

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ D L L
DEP CLK

# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Information Associated with Account (252) 474-4844
That is Stored at Premises Controlled by US Cellular

)
)
)
)
)

Case No. 4:17 mj 1157 - JG

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A of Affidavit (incorporated by reference).

located in the _____ Northern _____ District of _____ Illinois _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B of Affidavit (incorporated by reference).

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Poss. with Intent to Distribute Controlled Substances |
| 21 U.S.C. § 846 | Conspiracy to Distrib. and Poss. with Intent to Distribute Controlled Substances |

The application is based on these facts:

See attached affidavit.

☐ Continued on the attached sheet.

☑ Delayed notice of _____ days (give exact ending date if more than 30 days: __12/15/2017__ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kevin J. Doyle, ATF TFO
*Printed name and title*

On this day, **KEVIN J. Doyle** appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this Application for a Search Warrant.

Date: 7 September 2017

*Judge's signature*

Hon. James E. Gates, U.S. Magistrate Judge
*Printed name and title*

City and state: Raleigh, North Carolina

FILED

SEP 0 7 2017

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
D C
DEP CLK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ACCOUNT (252) 474-4844 THAT IS STORED AT PREMISES CONTROLLED BY US CELLULAR** | Case No. <br> 4:17 mj 1157-5G <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Kevin J. Doyle, a Task Force Officer (TFO) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) being first duly sworn, deposes and states under oath as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises owned, maintained, controlled, or operated by United States Cellular Corporation d/b/a US Cellular (hereinafter referred to as "US Cellular"), a wireless provider headquartered at One Pierce Place, Suite 800, Itasca, IL 60143. The accounts to be searched are of cellular telephone with assigned call number **(252) 474-4844** ("**Target Cell Phone**"), used by **Calvin WILSON**. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made



in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require US Cellular to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.    The **Target Cell Phone** has been identified through ongoing an ATF investigation based in New Bern, North Carolina. This Affidavit is based on my personal knowledge, observation, and participation in this investigation, as well as interviews and analysis of reports (both written and verbal) provided by other federal, state, and local law enforcement officers and employees assigned to this case during the course of their official duties. On the basis of my personal participation in this investigation and on the basis of information which I have reviewed and determined to be reliable, I allege that the facts contained in this Affidavit show probable cause for the issuance of this search warrant for the aforementioned content.

3.    Since this Affidavit is being submitted for the purpose of obtaining a search warrant for message content sent to or received by specific **Target Cell Phone**, your affiant has not included each and every fact known to him concerning this investigation. Your affiant has set forth only the facts that he

2

believes are necessary to establish probable cause for the issuance of a search warrant for the aforementioned information.

4.    I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is employed by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

5.    I am a Police Detective with the Jacksonville, NC, Police Department. I have been employed at the Jacksonville Police Department since June of 2004. I am currently assigned to the Special Operations Division (SOD) as a narcotics detective. I have been assigned to SOD since October of 2008. Within my role as an SOD investigator, I have been assigned full-time as a Task Force Officer with the Bureau Alcohol, Tobacco, Firearms and Explosives (ATF) Wilmington Field Office, and have been since October of 2014. It is within my duties as a SOD/TFO investigator to investigate complex state and federal drug trafficking conspiracy cases using the electronic interception of telephonic communications and the use of vehicular GPS systems to supplement physical surveillance. I have directed and participated in investigations of criminal violations of the federal narcotics, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846, and Title 18, United States Code, Sections 922, and 924; as well as the

3



aiding and abetting the above offenses, in violation of Title 18, United States Code, Section 2.

6.     During both my time as a detective and TFO, I have also spoken on numerous occasions with informants, suspects, and experienced narcotics investigators concerning the manner, means, methods, and practices that drug traffickers use to further the operation of their drug trafficking organizations and the most effective methods of investigating and dismantling such organizations.

7.     I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code. I have testified in state and federal judicial proceedings and prosecutions for violations of controlled substances and firearm laws.

8.     As an ATF Task Force Officer/JPD SOD Detective, I have participated in at least two (2) prior investigations that have utilized court-ordered interception of wire and electronic communications and use of GPS devices as an investigative tool. I am therefore familiar with the lawful use of electronic and wire surveillance equipment in investigations of narcotics distribution. Through these experiences, I have learned how large-scale drug trafficking organizations operate. I have also become

4

familiar with street terminology relating to the distribution of controlled substances.

9. Based upon your affiant's training, experience, and participation in investigations of suspects involved with large amounts of cocaine, and/ or other controlled substances, your affiant knows:

      a. Drug traffickers frequently use cellular telephones to conduct their drug trafficking activities. Drug traffickers frequently use cellular telephones to make and receive phone calls and send and receive messages via "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), which are often referred to generically as "text messages", to communicate with their sources of supply of drugs and drug customers in order to negotiate and facilitate the purchase and sale of drugs.

      b. I am familiar with the methods used by traffickers of cocaine, methamphetamine, heroin, marijuana, and other controlled substances to conduct their business, including, but not limited to: methods of importing and distributing these drugs; use of numerical codes and code words to conceal the illegal nature of their transactions; and use of

5



firearms to protect themselves, their drugs, and drug proceeds.

10.   I know that the facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

11.   Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (hereinafter referred to as "TARGET OFFENSES") have been committed, are being committed, and will be committed by Calvin WILSON, hereinafter referred to as WILSON, and others.   There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

12.   The **Target Cell Phone** is a post-paid cellular telephone account with the subscriber listed as Lashawna MCCOTTER and a subscriber address of 2709 New Bern Avenue, New Bern, North Carolina. MCCOTTER has been identified as the live-in girlfriend of WILSON. The account was activated on September 14, 2011.   The **Target Cell Phone** is being used by WILSON, date of birth xx-xx-

6



1983, with a current associated address of 2800 Moore Avenue, New Bern, North Carolina, 28560.

## THE INVESTIGATION

13. In May 2015, ATF began working with the New Bern, North Carolina Police Department to investigate a series of gang-related shootings and homicides that began at the end of 2014. During the course of the investigation it was learned that the United Blood Nation, namely a Nine (9) Trey set, was involved in bringing multi-kilogram quantities of heroin into the Eastern District of North Carolina from the Queens area of New York City. ATF agents were able to identify an organized criminal enterprise operating within New Bern, North Carolina for almost a decade. During interviews, it was learned that this DTO has been involved in the trafficking of heroin, cocaine, and marijuana dating back as far as 2010. Members of this DTO are involved in a variety of criminal activities. Some members are involved in the purchasing and transporting of multi-kilogram shipments of narcotics. Other members are involved in the distribution of narcotics on a regional level. Still other members are involved in the local distribution of narcotics. Some members are known to carry firearms and have been implicated in numerous shootings and/or murders. This DTO supplies a number of narcotics users, many of whom are known to be responsible for breaking and entering violations, during which

7



firearms have been stolen. The narcotic users then capitalize on their connection to this organization to sell/trade firearms for narcotics. Over the course of this investigation, several stolen firearms have been recovered and subsequently linked to shooting incidents being investigated by police.

14. During the course of this investigation agents have conducted numerous interviews with people familiar with the DTO. Through these interviews, and other investigative techniques, agents have identified sources of supply used by the WILSON DTO as multi-kilogram level drug traffickers based in Queens, New York. Agents have also learned WILSON's organization is responsible for distributing significant amounts of cocaine and heroin in Jacksonville, North Carolina, Pamlico County, North Carolina and other locations in the Eastern District of North Carolina. Additionally, agents have identified several subjects WILSON uses to sell drugs for him as well as subjects supplied with drugs by WILSON. Some of these subjects are known for their violence.

15. Between November 2016 and January 2017, investigators utilized a confidential source (CS) to conduct four controlled purchases of heroin from WILSON's subordinate, Mario Correllus BARGNEARE. Following the controlled purchases, field tests were conducted on the purchased heroin, which showed positive for

8



heroin. The substances were later confirmed to be heroin by an analysis conducted by the NC Crime Lab.

16.    Between January and April 2017, investigators utilized the CS to conduct four additional controlled purchases of heroin from BARGNEARE and WILSON's other subordinate, Derrick WIGGINS. Detectives conducted post-surveillance on BARGNEARE and WIGGINS before and after each of the controlled purchases, and observed BARGNEARE and WIGGINS leaving directly from and returning directly to WILSON's residence of 2800 Moore Avenue, further corroborating the CS information that WILSON is the SOS. Following the controlled purchases, field tests were conducted on the purchased heroin, which showed positive for heroin.

17. On April 24, 2017, New Bern Police Department investigators conducted a buy and bust operation on WIGGINS. A confidential informant purchased $80.00 worth of heroin from WIGGINS, who was immediately arrested following the drug transaction with the informant. WIGGINS refused to cooperate and was placed in the Craven County Detention Facility with charges pending. Following this arrest operation, BARGNEARE contacted the CS who has conducted the previous controlled purchases, advising that BARGNEARE's new telephone number was (919) 622-9758. I know through experience that when arrests are made of one DTO member, other members will routinely drop old numbers and obtain new ones

9

in attempt to avoid/evade law enforcement investigations. It was apparent to me that this was the case. The CS also stated that he/she believed BARGNEARE changed his telephone numbers as a result of WIGGINS' arrest.

18. On April 25, 2017, the day following WIGGINS's arrest, the account for the previous phone number associated with WILSON changed telephone numbers from (252) 229-8048 to **(252) 474-4844** (**Target Cell Phone**). A phone toll analysis of the **Target Cell Phone** shows WILSON contacting identified members of the DTO, consistent with that of the previous number. Additionally, the **Target Cell Phone** number did not exist until the service of WILSON's previous phone stopped and was changed to this number.

19. On May 19, 2017, investigators met with the CS to arrange the purchase of 7 grams of heroin from BARGNEARE. The deal took place at 2508 Dogwood Avenue, New Bern NC. Surveillance teams were able to identify BARGNEARE come directly from WILSON's residence prior to the transaction and go directly back to WILSON's residence following the deal, further corroborating CS information that WILSON is the SOS. Following the controlled purchase, a field test was conducted on the purchased heroin. Investigators gained a positive result the purchased evidence was in fact heroin. The heroin has since been submitted to the North Carolina Crime Lab for analysis.



20.    On June 8, 2017, investigators met with a CS to arrange the purchase of 14 grams of heroin from BARGNEARE. The deal took place in the Pembroke area of New Bern, just around the corner from WILSON's residence. Surveillance of WILSON's residence was able to identify BARGNEARE leave WILSON's residence just prior to the deal, make contact with the CS, and walk directly back to WILSON's residence, further corroborating CS information that WILSON is the SOS. Following the controlled purchase, a field test was conducted on the purchased heroin. Investigators gained a positive result the purchased evidence was in fact heroin. The heroin has since been submitted to the North Carolina Crime Lab for analysis.

21.    On June 15, 2017, investigators met with the CS to arrange the controlled purchase of five (5) grams of heroin for $1,200.00 US currency from BARGNEARE. The deal took place at the intersection of McKinley Avenue and Sycamore Street in the Pembroke subdivision. BARGNEARE was observed walking out of WILSON's residence just prior to meeting with the CS. The deal took place within the CS's vehicle where BARGNEARE exchanged the five (5) grams of heroin for $1,200.00 US currency. Following the transaction, BARGNEARE was observed walking back to WILSON's residence, further corroborating CS information that WILSON serves as BARGNEARE's SOS. Following the controlled purchase, a field

11

test was conducted on the purchased heroin. Investigators gained a positive result the purchased evidence was in fact heroin. The heroin has since been submitted to the North Carolina Crime Lab for analysis.

22.  On July 7, 2017, investigators met with the CS to arrange the controlled purchase of ten (10) grams of heroin for $2,300.00 US currency from BARGNEARE.  The deal took place two streets over from WILSON's residence in the Pembroke subdivision.  The transaction took place in the exact same manner it did on the previous deals, further corroborating CS information that WILSON is the SOS. Following the controlled purchase, a field test was conducted on the purchased heroin. Investigators gained a positive result the purchased evidence was in fact heroin. The heroin has since been submitted to the North Carolina Crime Lab for analysis.

23.  On July 26, 2017, the Honorable James C. Dever III, Chief United States District Judge, Eastern District of North Carolina, issued an Order authorizing the interception of wire and electronic communications over BARGNEARE's telephone. Interceptions began on July 27, 2017.  On August 17, 2017, the Honorable James C. Dever III, Chief United States District Judge, Eastern District of North Carolina, issued an Order authorizing the continued interception of wire and electronic communications over BARGNEARE's telephone and the initial interception of wire communications over the **Target**

12

**Cell Phone.** Interceptions began on August 17, 2017, and are currently ongoing.

24. During the period of interception, investigators have intercepted numerous telephone calls between WILSON, using the **Target Cell Phone,** and other members of the DTO, including BARGNEARE, WIGGINS, Roy James NOLON, and Josiah KNOX, in which they discuss the sale of heroin in the New Bern area and methods to avoid police detection. For example, on August 22, 2017 at 1042 hours, investigators intercepted an incoming telephone call from Josiah KNOX to BARGNEARE. KNOX has been identified as a subordinate to WILSON. In the captured telephone call, KNOX inquired if "BRUH", previously identified through wire interceptions as a common nickname within the organization for WILSON, was back from New York because he was "all out." Based on the context of the conversation and what detectives know about the investigation, detectives believe KNOX was referring to being out of heroin. The following was captured:

[BEGINNING OF CALL]

BARGNEARE:    Yup!

KNOX:         What you're doing bruh?

BARGNEARE:    What up?

KNOX:         Chilling, chilling. I'm all out now, is Bruh back around?

BARGNEARE:    Shit, I haven't talk to him yet.

KNOX:         Oh okay, okay. Oh, shit where are you at?

13

BARGNEARE:    In New Bern.

KNOX:         Alright, I will call you when I get over there.

[END OF CALL]

25.  At 1216 hours, investigators intercepted an incoming telephone call from KNOX to BARGNEARE. In that call KNOX inquired if BARGNEARE was still in the neighborhood. BARGNEARE answered in the affirmative, and KNOX told him that he will come by when he got out of the shower. Investigators believe this conversation meant that KNOX was arranging to pick up some heroin from BARGNEARE since KNOX was all out and his usual source, WILSON, was still out of town.

26.  At 1226 hours, investigators then intercepted an incoming telephone call to WILSON on the **Target Cell Phone** from BARGNEARE. BARGNEARE inquired where WILSON was and informed WILSON that "Joe," known to investigators to be Josiah KNOX, was attempting to get up with him. BARGNEARE wanted to know if WILSON wanted BARGNEARE to communicate with KNOX on his behalf. The following was captured:

[BEGINNING OF CALL]

WILSON:       Yo!

BARGNEARE:    Yo, what'up my nigga?

WILSON:       What's good man?

BARGNEARE:    Shit, I was just hollering at you.

WILSON:       Huh?

14

```
BARGNEARE:        I said, I was just hollowing at you.  Cause I
                  tried to holler at you the other day.

WILSON:           Why, what happened? Everything is cool, my nigga.

BARGNEARE:        Yeah I did, that shit was going straight to voice
                  mail. [Voices overlap] [Unintelligible]

WILSON:           [Voices overlap] [Unintelligible].

BARGNEARE:        [Voices overlap] [Unintelligible] that's why
                  little nigga called you, little nigga called you
                  from there, that shit, that shit [audio distorts]
                  [Unintelligible], hell yeah.

WILSON:           What's good, though?

BARGNEARE:        Nothing, just shit.  Just waiting for you to get
                  back up.

WILSON:           [Unintelligible].

BARGNEARE:        Alright, alright. That's what's up. Yeah.  Yo!
                  Joe trying to um, Joe trying to holler at you.

WILSON:           Where is he at?

BARGNEARE:        Shit, he told me would call me when he came
                  across town or something.  I ain't know if you
                  wanted me to holler at his phone or what?

WILSON:           Nah, just tell that nigga to call me.

BARGNEARE:        A'ight.

WILSON:           [Unintelligible].

BARGNEARE:        Shit, good.  Everything good, everything cool.

WILSON:           I'll be there [Unintelligible].

BARGNEARE:        A'ight bro.  Be safe on the road.

WILSON:           Yeah.

BARGNEARE:        Yeah.
```

                        [END OF CALL]


                             15



27. At 1226 hours, investigators intercepted an incoming telephone call from KNOX to WILSON on the **Target Cell Phone**. In the call, KNOX inquired if WILSON was back from New York. WILSON asked if KNOX was ready for his resupply. The following was captured:

[BEGINNING OF CALL]

WILSON:   Yo!

KNOX:     Yo, what's good ma?

WILSON:   What's good?

KNOX:     Trying to see if you're back around?

WILSON:   Huh?

KNOX:     You back around?

WILSON:   I'm about to leave though, [Unintelligible] are you ready?

KNOX:     Hell yeah.

WILSON:   A'ight. I'll holler [Unintelligible].

KNOX:     Okay, then.

WILSON:   A'ight.

[END OF CALL]

28. On August 30, 2017 at 1125 hours, investigators intercepted a telephone call coming from NOLON to WILSON over the **Target Cell Phone**. In that call, NOLON asked WILSON for 3 grams of heroin. WILSON indicated that he was not yet at the "trap," which is a common term for a house or location from which drugs are sold. WILSON advised NOLON to hold "tight" and that WILSON would get him the heroin. The following exchange was captured:

16



[BEGINNING OF CALL]

WILSON:     Yo!

NOLON:      Yo, do I still call the same Bro?

WILSON:     Huh?

NOLON:      Do you want me, Do I still calling bro for it?

WILSON:     Umm... I'm not in the trap [mumbles] I'm half way to the
            trap, to the trap.

NOLON:      I need three (3) of them.

WILSON:     A'ight, I got you. I got you, I give you my word, just
            hold tight.

NOLON:      A'ight, bet.

WILSON:     I want to holler at you about some other shit too
            though, I'll talk too you when I see you

NOLON:      A'ight, A'ight.

WILSON:     [Unintelligible].

NOLON:      A'ight.

                        [END OF CALL]


    29.  On September 4, 2017, investigators reviewed pen

register data on the **Target Cell Phone** and noted that WILSON

sent three non-intercepted text messages to NOLON. At 2107

hours, investigators intercepted a telephone call to NOLON from

WILSON using the **Target Cell Phone.** In the call, NOLON told

WILSON that NOLON was coming over the bridge and that he was

almost to Pembroke, WILSON's neighborhood. WILSON advised NOLON

that he had forgotten about him but NOLON stated that he was

about "to pull up in like two minutes." The following was

captured:

                              17



WILSON:          Yeah.

NOLON:           Yo.

WILSON:          What's good bro?

NOLON:           I'm on the bridge right now. [Silence] Yeah.

WILSON:          You say you on the bridge right now?

NOLON:           Yeah.

WILSON:          Alright. I was about to slide out I forgot about

                 your ass. [Unintelligible] I'm supposed to do

                 something.

NOLON:           [Unintelligible].

WILSON:          You can do shit man.

NOLON:           You are in Pembroke right now?

WILSON:          Yeah come to Pembroke.

NOLON:           Alright, I'm about to pull up in like two minutes.

[END OF CALL]

30.    Shortly after, investigators intercepted a call from
NOLON to WILSON on the **Target Cell Phone** in which NOLON
indicated to WILSON that he was outside WILSON's residence.
Based on the other conversations that have been intercepted
between WILSON and NOLON, I believe that these intercepted calls
and the earlier text messages preceded a resupply of heroin by
NOLON from WILSON.  This activity was consistent with other drug



deals investigators have participated in with members of the WILSON DTO and/or have captured over interception.

31. On September 5, 2017 at 1211 hours, investigators intercepted an incoming telephone call from an unidentified caller using telephone number (252) 617-9229 to WILSON on the **Target Cell Phone**. In the call, investigators intercepted the unidentified caller ordering 2 grams of heroin from WILSON. After WILSON agreed to the deal, the unidentified caller then advised WILSON that he would come to WILSON's residence to pick up the heroin. The following transaction was captured:

[BEGINNING OF CALL]

WILSON:    What up big dog?

UM9229:    Let me uh, get two (2) big dog.

WILSON:    A'ight

UM9229:    You, you, Imma, Imma about to come over there.

WILSON:    A'right.

UM9229:    A'ight

[END OF CALL]

32. At 1257 hours, investigators intercepted a second incoming telephone call from the unidentified caller to WILSON on the **Target Cell Phone**. In that call, the unidentified caller indicated to WILSON that he was going to need another gram of heroin. WILSON agreed to the deal, and the unidentified caller stated that he was trying to find a ride.

19

```
                        [BEGINNING OF CALL]
WILSON:    Yo!
UM9229:    Yo, I need another one, Big Dog
WILSON:    A'ight
UM9229:    Um, I'm trying to find a ride right now, I'm coming
           though. Imma about to find a ride right quick.
WILSON:    A'right.
UM9229:    A'ight
                          [END OF CALL]
```

## Target Cell Phone Analysis

33. Since the beginning of the period interception of the **Target Cell Phone** on August 17, 2017, the device has made or received one thousand seven hundred forty-nine (1,749) calls; however, this number includes calls which have gone unanswered or have not connected. In addition, the device has made or received 180 text messages.

34. Among the telephones frequently communicating with WILSON via text are known drug traffickers. For example, NOLON has communicated with WILSON on the **Target Cell Phone** one hundred and three (103) times between May 7, 2017, to September 4, 2017. Ten (10) of these communications appear to have been text messages, the last being on September 4, 2017, as discussed above. Investigators have conducted multiple controlled purchases of heroin from NOLON during the course of the investigation and, as discussed above, have intercepted numerous telephone conversations

20



between NOLON and WILSON on the **Target Cell Phone** arranging the sale of heroin.

35. Based on this information, I believe WILSON is using the **Target Cell Phone** to facilitate and support his drug dealing and that it is probable that WILSON is using text messages to further that illegal activity.

## Communications Stored by US Cellular

36. In my training and experience, I have learned that US Cellular is a company that provides cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for US Cellular subscribers may be located on the computers of US Cellular. Further, I am aware that computers located at US Cellular contain information and other stored electronic communications belonging to unrelated third parties.

37. Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of US Cellular for weeks or months.

38. Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages

21



(photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by US Cellular for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

39. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

22

40.  Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

41.  Many wireless providers retain information about the location in which a particular communication was transmitted or received.  This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas)

23



received a radio signal from the cellular device and thereby transmitted or received the communication in question.

42. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates, times and sometimes, places, of payments and the means and source of payment (including any credit card or bank account number).

43. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts

24

between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

44. As explained below, information stored at the wireless provider, including that described above, may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can indicate who has used or controlled the cellular device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, data collected at the time of account sign-up, information relating to account payments, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled a cellular device at a relevant time. Further, such stored electronic data can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. This

"timeline" information may tend to either inculpate or exculpate the cellular device owner. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video). Last, stored electronic data may provide relevant insight into the state of mind of the cellular device's owner and/or user as it relates to the offense under investigation. For example, information relating to the cellular device in the possession of the wireless provider may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

45. On September 6, 2017, a preservation request was made to US Cellular pursuant to 18 U.S.C. § 2703(f) to preserve all stored communications, records, and other evidence in its possession regarding the **Target Cell Phone**.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

46. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require

26

US Cellular to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

47. Based on the foregoing, I submit that there is probable cause to believe that violations of Title 21, U.S.C., Sections 841(a) and 846 have occurred, and that evidence of those violations will be found in the stored communications listed in Attachment B, which are associated with the **Target Cell Phone** described in Attachment A.

48. Based upon the foregoing, I respectfully request that this Court issue a search warrant to obtain the stored communications of the **Target Cell Phone** described in Attachment A, and to authorize the seizure of the items described in Attachment B.

49. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the

27



United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

50. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

51. It is further requested that, pursuant to 18 U.S.C. § 3103a(b)(3) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until December 15, 2017. The period of delayed notice for the Title III wiretap 4:17-MJ-1124-D is set to expire on December 15, 2017. Because the investigations underlying the Title III wiretap and the search warrant in the above-captioned matter are so closely intertwined, service of notice at this time could adversely affect law enforcement officers' abilities to effectively continue their investigation, could result in the flight of known and unknown individuals as well as those targeted for investigation prior to the issuance of any future indictment(s), could result in destruction or tampering with evidence, or could endanger the life or physical safety of individuals related to this investigation. See 18 U.S.C. § 3103a(b)(1), incorporating 18 U.S.C. § 2705(a)(B)(2). Giving notice of the above-captioned search warrant before that time would have the aforementioned adverse effects upon that wiretap and any

28

other potential wiretap that the Government will apply for with respect to the DTO. There is reasonable necessity for the use of the technique described above and the facts of the case justify a longer delay, for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2) & (c).

Respectfully submitted,

_____
Kevin J. Doyle
Task Force Officer
Bureau of Alcohol, Tobacco,
Firearms, and Explosives


On this ___7th___ day of September 2017, Kevin J. Doyle, appeared
before me via reliable electronic means, was placed under oath,
and attested to the contents of this Affidavit.

_____
HON. JAMES E. GATES
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

This warrant applies to records and information associated with the cellular telephone assigned call number (252) 474-4844 (**Target Cell Phone**), which are stored at premises owned, maintained, controlled, or operated by United States Cellular Corporation d/b/a US Cellular (hereinafter referred to as "the Provider"), a wireless provider headquartered at One Pierce Place, Suite 800, Itasca, IL 60143.



## Attachment B

### PARTICULAR THINGS TO BE SEIZED

**I.  Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **Target Cell Phone** listed in Attachment A:

> a. The content of historical short messaging service ("SMS") and multimedia messaging service ("MMS") messages sent from or received by the Target Cell Phone;
> b. All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the Target Cell Phones; and
> c. All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used.

**II.  Information to be searched for and seized by the Government**

This warrant authorizes (i) the search of the property identified in Attachment A for only the following and (ii) authorizes the seizure of the items listed below only to the extent they constitute the following:

31



(a)   evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 ("subject violations"), which were committed between December 2016 up through the present by Calvin WILSON.

Subject to the foregoing sentences, such information includes, for the subject accounts identified in Attachment A, information pertaining to the following matters:

(a)  The possession, sale, transportation, or distribution of illegal drugs and any conspiracy to engage in the same;

(b)  Evidence indicating how and when the cellular device and associated cellular service was used to determine the chronological context of cellular device use, account access, and events relating to the crime under investigation;

(c)  Evidence indicating the geographic location of the cellular device at times relevant to the investigation;

(d)  Evidence indicating the cellular device owner or user's state of mind as it relates to the crime under investigation; and

(e)  The identity of the person(s) who created the account associated with the cellular device and/or used the cellular device, including records that help reveal the whereabouts of such person(s).

32



### III. 18 U.S.C. § 3103a(b)(2)

Notwithstanding any other provision of this warrant, it prohibits the seizure of the following, pursuant to 18 U.S.C. § 3108a(b)(2): any tangible property; and any wire or electronic communication as defined in 18 U.S.C. § 2510.

This warrant authorizes the seizure of stored wire and electronic information because such seizure is reasonably necessary pursuant to 18 U.S.C. § 3103a(b)(2).

